## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI BEACH DIVISION

**EMILY CASEY**, on behalf of herself and all others similarly situated,

Plaintiff,

v.

**MONTE NIDO & AFFILIATES HOLDINGS, LLC,**

Defendants.

No. 1:24-cv-23119

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Emily Casey ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Monte Nido & Affiliates Holdings, LLC ("Monte Nido" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.      This class action arises from Monte Nido's failure to protect highly sensitive data.

2.      Monte Nido is a Florida-based mental health provider that specializes in the treatment of eating disorders.[1]

3.      As such, Monte Nido stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI") about its current and former patients.

---

[1] https://www.montenido.com/about (last visited August 15, 2024).

But Monte Nido lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.      According to Defendant's Breach Notice, the cybercriminals had access to Monte Nido's network from September 16, 2023 until September 22, 2023—an entire week—before the breach was discovered. In other words, Monte Nido had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former patients' PHI.

5.      On information and belief, cybercriminals were able to breach Monte Nido's systems because Monte Nido failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PHI. In short, Monte Nido's failures placed the Class's PHI in a vulnerable position—rendering them easy targets for cybercriminals.

6.      Plaintiff is a Data Breach victim, having received a breach notice— a sample of which is attached as Exhibit A.  She brings this class action on behalf of herself, and all others harmed by Monte Nido's misconduct.

7.      The exposure of one's PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and patients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8.      Plaintiff, Emily Casey, is a natural person and citizen of Florida. She resides in Ocean Drive, Florida where she intends to remain.

2

9.      Defendant, Monte Nido & Affiliates Holdings, LLC is a Limited Liability Company formed in Delaware with its principal place of business at 6100 SW 76th Street, Miami, Florida, 33143.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Monte Nido and at least one class member are citizens of different states. And there are over 100 putative Class members.

11.     This Court has personal jurisdiction over Monte Nido because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

12.     Venue is proper in this Court because Monte Nido's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Monte Nido Collected and Stored the PHI of Plaintiff and the Class***

13.     Monte Nido is Florida-based mental healthcare provider that specializes in the treatment of eating disorders with facilities around the country.[2]

14.     As part of its business, Monte Nido receives and maintains the PHI of thousands of its current and former patients.

15.     In collecting and maintaining the PHI, Monte Nido agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PHI.

---

[2] *Id.*

16.     Under state and federal law, businesses like Monte Nido have duties to protect its current and former patients' PHI and to notify them about breaches.

17.     Monte Nido recognizes these duties, declaring in its "Privacy Policy" that:

a.      "We protect the confidentiality and security of information we obtain in the course of business."

b.      "We use commercially reasonable safeguards, such as industry-standard encryption technology, to help keep the information collected through the Site secure."

c.      "When Personal Information is transmitted to other websites, it is protected through the use of encryption, such as the Secure Sockets Layer (SSL) protocol."

d.      "We strive to take appropriate security measures to protect against unauthorized access to or alteration of your Personal Information."[3]

18.     Further, in its "Privacy Practices," Monte Nido declares:

a.      "Monte Nido and Affiliates or "MNA" understands that information about you and your health is confidential. We are committed to protecting the privacy of this information. We use and share your health information only as permitted or required by federal and state laws."

b.      "We are required by law to maintain the privacy of your protected health information, to provide you with this Notice of our legal duties and privacy practices with respect to your health information, to notify affected

---

[3] https://www.montenido.com/privacy-policy (last visited August 15, 2024).

individuals following a breach of unsecured protected health information, and to follow the terms of the Notice currently in effect." [4]

***Monte Nido's Data Breach***

19.     From September 16, 2023, until September 22, 2023, an unauthorized actor gained access to Monte Nido's systems resulting in the access to "certain data containing some of [patiets'] personal information." Ex. A.

20.     Worryingly, Monte Nido was unable to detect the Data Breach until September 22, 2023. Ex. A. Thus, cybercriminals had an *entire week* to peruse and exfiltrate PHI before being detected.

21.     Because of Monte Nido's Data Breach, at least the following types of PHI were compromised:

      a.    name;

      b.    Social Security number;

      c.    phone number;

      d.    email address;

      e.    date of birth;

      f.    driver's license number;

      g.    government identification number;

      h.    individual taxpayer identification number;

      i.    birth certificate;

      j.    email address and password;

      k.    digital signature;

---

[4] https://www.montenido.com/privacy-practices (last visited August 15, 2024).

l.      passport number;

m.      financial account information (account number, routing number or password, or credit and/or debit card number with password or security code);

n.      worker's compensation claim information;

o.      medical record number;

p.      patient account number;

q.      medical information (including prescription information, dates of service, medical history, condition, treatment, or diagnosis);

r.      certificate and/or license number; and

s.      health insurance information.[5]

22.      And yet, Monte Nido waited until August 9, 2024, before it began notifying the class—almost an *entire year* after it discovered the Data Breach.[6]

23.      Thus, Monte Nido kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

24.      And when Monte Nido did notify Plaintiff and the Class of the Data Breach, Monte Nido acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiff and the Class to:

a.      "remain vigilant by monitoring account activity and credit reports;"

b.      "set up free fraud alerts from nationwide credit bureaus;"

c.      "request and review your free credit report;"

---

[5] https://www.montenido.com/data-notification (last visited August 15, 2024).
[6] *Id*.

d.      "place an initial one (1) year "fraud alert" on your credit files;" and

e.      "request a "security freeze" be placed on your credit file." Ex. A.

25.     Monte Nido also acknowledged the risks associated with stolen medical information, encouraging victims to "protect yourself against medical identity theft" in the following ways:

a.      "Only share health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care;"

b.      "Review the "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize;"

c.      "If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records from the date of the potential access (noted above) to current date." Ex A.

26.     Monte Nido failed its duties when its inadequate security practices caused the Data Breach. In other words, Monte Nido's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PHI. And thus, Monte Nido caused widespread injury and monetary damages.

27.     Since the breach, Monte Nido has declared that it is "implementing additional cybersecurity safeguards, as needed, enhancing [its] employee cybersecurity training, and improving [its] cybersecurity policies, procedures, and protocols."[7] But this is too little too late.

---

[7] *Id*.

Simply put, these measures—which Monte Nido now recognizes as necessary—should have been implemented *before* the Data Breach.

28.     On information and belief, Monte Nido failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

29.     It is unknown how many individuals were impacted by the Data Breach, however upon information and belief, the victims include Monte Nido's current and former patients.

30.     Further, the Notice of Data Breach shows that Monte Nido cannot—or will not—determine the full scope of the Data Breach, as Monte Nido has been unable to determine precisely how many individuals were impacted, how the breach occurred, and why it took them a year to notified affected individuals.

31.     Monte Nido has done little to remedy its Data Breach. Monte Nido has offered only *some* victims credit monitoring and identity related services. But upon information and belief, Plaintiff was not offered these services. Regardless, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Monte Nido inflicted upon them.

32.     Because of Monte Nido's Data Breach, the PHI of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

33.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[8]

---

[8] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

34.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

35.     Thus, on information and belief, Plaintiff's and the Class's stolen PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

36.     Plaintiff Emily Casey is a former patient of Monte Nido, having received services at Monte Nido's treatment center in Miami.

37.     Thus, Monte Nido obtained and maintained Plaintiff's PHI.

38.     As a result, Plaintiff was injured by Monte Nido's Data Breach.

39.     As a condition of receiving services with Defendant, Plaintiff provided Monte Nido with her PHI and allowed them to maintain her PHI. Monte Nido used that PHI to facilitate its services.

40.     Plaintiff trusted the company would use reasonable measures to protect her PHI according to Monte Nido's internal policies, as well as state and federal law. Monte Nido obtained and continues to maintain Plaintiff's PHI and has a continuing legal duty and obligation to protect that PHI from unauthorized access and disclosure.

41.     Plaintiff reasonably understood that a portion of the funds she paid for services would be used to pay for adequate cybersecurity and protection of PHI.

42.     Plaintiff does not recall ever learning that her information was compromised in a data breach incident—other than the breach at issue here.

43.     Plaintiff received a Notice of Data Breach from Defendant.

44.     Thus, on information and belief, Plaintiff's PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

45.     Through its Data Breach, Monte Nido compromised Plaintiff's:

     a.     full name;

     b.     address;

     c.     health insurance information; and

     d.     medical information.

46.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from medical identity theft. After all, Monte Nido directed Plaintiff to take those steps in its breach notice.

47.     Plaintiff fears for the security of her medical information and worries about what information was exposed in the Data Breach.

48.     Because of Monte Nido's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

49.     Plaintiff suffered actual injury from the exposure and theft of her PHI—which violates her rights to privacy.

50.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and medical identity theft—all because Monte Nido's Data Breach placed Plaintiff's PHI right in the hands of criminals.

51.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

52.     Today, Plaintiff has a continuing interest in ensuring that her PHI—which, upon information and belief, remains backed up in Monte Nido's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

53.     Because of Monte Nido's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.     loss of the opportunity to control how their PHI is used;

b.     diminution in value of their PHI;

c.     compromise and continuing publication of their PHI;

d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.     delay in receipt of tax refund monies;

g.     unauthorized use of their stolen PHI; and

h.     continued risk to their PHI—which remains in Monte Nido's possession— and is thus as risk for futures breaches so long as Monte Nido fails to take appropriate measures to protect the PHI.

54.     Stolen PHI is one of the most valuable commodities on the criminal information black market.

55.     According to the National Association of Healthcare Access Management, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information. PHI has such a high value because it contains highly sensitive information, such as social security numbers, birth dates, addresses, credit card numbers, telephone numbers and medical conditions. This data is incredibly valuable on the black market because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been stolen."[9]

56.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[10]

57.     Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

58.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

---

[9] https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information#:~:text=Personal%20medical%20data%20is%20said,telephone%20numbers%20and%20medical%20conditions, (last visited August 15, 2024).
[10] https://www.ahu.edu/blog/data-security-in-healthcare (last visited August 15, 2024).

59.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[11]

60.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[12]

61.     The HIPAA Journal article goes on to explain that patient records, like those stolen from Monte Nido, are "often processed and packaged with other illegally obtained data to create full record sets (the previously mentioned Fullz package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[13]

62.     Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

---

[11] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited August 15, 2024).
[12] *Id.*
[13] *Id.*

63.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[14]

64.     These significant increases in attacks to companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant Monte Nido.

65.     A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[15] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[16]

66.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

67.     It is incorrect to assume that reimbursing a victim for a financial loss due to fraud makes that individual whole again. Similar to the GAO's study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for

---

[14] https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited August 15, 2024).
[15] https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited August 15, 2024).
[16] *Id.*

fraudulent purposes, about a third (32%) spent a month or more resolving problems."[17] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."[18]

68.     Further, once a patient's medical information is in the hands of thieves, they have access to the individual's health insurance and may use it to obtain free medical care, which can "ruin credit and take months, or even years, to resolve."[19]

69.     As the fraudulent activity resulting from the Data Breach may not come to light for years, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Monte Nido Knew—Or Should Have Known—of the Risk of a Data Breach***

70.     Monte Nido's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

71.     In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[20]

72.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[17] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last visited August 15, 2024).
[18] *Id.*
[19] https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information#:~:text=Personal%20medical%20data%20is%20said,telephone%20numbers%20and%20medical%20conditions (last visited August 15, 2024).
[20] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

lesser IT defenses and a high incentive to regain access to their data quickly."[21]

73.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Monte Nido's industry, including Defendant.

***Monte Nido Failed to Follow FTC Guidelines***

74.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

75.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[22]  The FTC declared that, *inter alia*, businesses must:

a.     protect the personal customer information that they keep;

b.     properly dispose of personal information that is no longer needed;

c.     encrypt information stored on computer networks;

d.     understand their network's vulnerabilities; and

e.     implement policies to correct security problems.

76.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

77.     Furthermore, the FTC explains that companies must:

---

[21] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[22] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

a.    not maintain information longer than is needed to authorize a transaction;

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

78.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

79.    In short, Monte Nido's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Monte Nido Failed to Follow Industry Standards***

80.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

81.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email

management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

82.     Monte Nido failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Monte Nido opened the door to the criminals—thereby causing the Data Breach.

***Monte Nido Violated HIPAA***

84.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[23]

---

[23] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

85.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI and PHI is properly maintained.[24]

86.     The Data Breach itself resulted from a combination of inadequacies showing Monte Nido failed to comply with safeguards mandated by HIPAA. Monte Nido's security failures include, but are not limited to:

     a.     failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

     b.     failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

     c.     failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

     d.     failing to ensure compliance with HIPAA security standards by Monte Nido's workforce in violation of 45 C.F.R. § 164.306(a)(4);

     e.     failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

---

[24] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.   failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.   failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.   failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

87.   Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Monte Nido failed to comply with safeguards mandated by HIPAA regulations.

**CLASS ACTION ALLEGATIONS**

88.   Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PHI was compromised in the Data Breach discovered by Monte Nido in September 2023, including all those individuals who received notice of the breach.

89.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Monte Nido has a controlling interest, any Monte Nido officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

90.     Plaintiff reserves the right to amend the class definition.

91.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

92.     Ascertainability. All members of the proposed Class are readily ascertainable from information in Monte Nido's custody and control. After all, Monte Nido already identified some individuals and sent them data breach notices.

93.     Numerosity. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least thousands of members.

94.     Typicality. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

95.     Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

96.     Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

      a.     if Monte Nido had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PHI;

      b.     if Monte Nido failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.     if Monte Nido were negligent in maintaining, protecting, and securing PHI;

      d.     if Monte Nido breached contract promises to safeguard Plaintiff and the Class's PHI;

      e.     if Monte Nido took reasonable measures to determine the extent of the Data Breach after discovering it;

      f.     if Monte Nido's Breach Notice was reasonable;

      g.     if the Data Breach caused Plaintiff and the Class injuries;

      h.     what the proper damages measure is; and

      i.     if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

97.     <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Monte Nido would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties

and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

98.     Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

99.     Plaintiff and the Class entrusted their PHI to Monte Nido on the premise and with the understanding that Monte Nido would safeguard their PHI, use their PHI for  to provide services only, and/or not disclose their PHI to unauthorized third parties.

100.     Monte Nido owed a duty of care to Plaintiff and Class members because it was foreseeable that Monte Nido's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PHI in a data breach. And here, that foreseeable danger came to pass.

101.     Monte Nido has full knowledge of the sensitivity of the PHI and the types of harm that Plaintiff and the Class could and would suffer if their PHI was wrongfully disclosed.

102.     Monte Nido owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Monte Nido knew or should have known would suffer injury-in-fact from Monte Nido's inadequate security practices. After all, Monte Nido actively sought and obtained Plaintiff and Class members' PHI.

103.     Monte Nido owed—to Plaintiff and Class members—at least the following duties to:

a. exercise reasonable care in handling and using the PHI in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PHI.

104. Thus, Monte Nido owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

105. Monte Nido also had a duty to exercise appropriate clearinghouse practices to remove PHI it was no longer required to retain under applicable regulations.

106. Monte Nido knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

107. Monte Nido's duty to use reasonable security measures arose because of the special relationship that existed between Monte Nido and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Monte Nido with their confidential PHI, a necessary part of obtaining services from Defendant.

108.     Under the FTC Act, 15 U.S.C. § 45, Monte Nido had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PHI.

109.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Monte Nido's duty to protect Plaintiff and the Class members' sensitive PHI.

110.     Monte Nido violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PHI and not complying with applicable industry standards as described in detail herein. Monte Nido's conduct was particularly unreasonable given the nature and amount of PHI Monte Nido had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

111.     Similarly, under HIPAA, Monte Nido had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PHI.

112.     Monte Nido violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Monte Nido's conduct was particularly unreasonable given the nature and amount of PHI that Monte Nido collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

113.     The risk that unauthorized persons would attempt to gain access to the PHI and misuse it was foreseeable. Given that Monte Nido hold vast amounts of PHI, it was inevitable that

unauthorized individuals would attempt to access Monte Nido's databases containing the PHI — whether by malware or otherwise.

114.    PHI is highly valuable, and Monte Nido knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

115.    Monte Nido improperly and inadequately safeguarded the PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

116.    Monte Nido breached these duties as evidenced by the Data Breach.

117.    Monte Nido acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PHI by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

118.    Monte Nido breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PHI of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

119.    Monte Nido further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

120.    Monte Nido has admitted that the PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

121.    As a direct and traceable result of Monte Nido's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

122.    And, on information and belief, Plaintiff's PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

123.    Monte Nido's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PHI by criminals, improper disclosure of their PHI, lost benefit of their bargain, lost value of their PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Monte Nido's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

124.    Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

125.    Plaintiff and Class members were required to provide their PHI to Monte Nido as a condition of receiving services provided by Defendant. Plaintiff and Class members provided their PHI to Monte Nido in exchange for Monte Nido's services.

126.    Plaintiff and Class members reasonably understood that a portion of the funds they paid Monte Nido would be used to pay for adequate cybersecurity measures.

127.     Plaintiff and Class members reasonably understood that Monte Nido would use adequate cybersecurity measures to protect the PHI that they were required to provide based on Monte Nido's duties under state and federal law and its internal policies.

128.     Plaintiff and the Class members accepted Monte Nido's offers by disclosing their PHI to Monte Nido in exchange for services.

129.     In turn, and through internal policies, Monte Nido agreed to protect and not disclose the PHI to unauthorized persons.

130.     In its Privacy Policy, Monte Nido represented that they had a legal duty to protect Plaintiff's and Class Member's PHI.

131.     Implicit in the parties' agreement was that Monte Nido would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PHI.

132.     After all, Plaintiff and Class members would not have entrusted their PHI to Monte Nido in the absence of such an agreement with Defendant.

133.     Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

134.     The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

135.     Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

136.     Monte Nido materially breached the contracts it entered with Plaintiff and Class members by:

    a.     failing to safeguard their information;

    b.     failing to notify them promptly of the intrusion into its computer systems that compromised such information.

    c.     failing to comply with industry standards;

    d.     failing to comply with the legal obligations necessarily incorporated into the agreements; and

    e.     failing to ensure the confidentiality and integrity of the electronic PHI that Monte Nido created, received, maintained, and transmitted.

137.     In these and other ways, Monte Nido violated its duty of good faith and fair dealing.

138.     Monte Nido's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

139.     And, on information and belief, Plaintiff's PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

140.     Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by Monte Nido's conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

141.     Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

142.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

143.     Monte Nido owed a duty to its current and former patients, including Plaintiff and the Class, to keep this information confidential.

144.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PHI is highly offensive to a reasonable person.

145.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

146.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

147.     Monte Nido acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

148.     Monte Nido acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

149.     Acting with knowledge, Monte Nido had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

150.     As a proximate result of Monte Nido's acts and omissions, the private and sensitive PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

151.     And, on information and belief, Plaintiff's PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

152.     Unless and until enjoined and restrained by order of this Court, Monte Nido's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PHI are still maintained by Monte Nido with their inadequate cybersecurity system and policies.

153.     Plaintiff and the Class have no adequate remedy at law for the injuries relating to Monte Nido's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Monte Nido's inability to safeguard the PHI of Plaintiff and the Class.

154.     In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class members, also seeks compensatory damages for Monte Nido's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

155.     Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

156.     This claim is pleaded in the alternative to the breach of implied contract claim.

157.    Plaintiff and Class members conferred a benefit upon Defendant. After all, Monte Nido benefitted from using their PHI to provide services and benefitted from the payment provided in exchange for services.

158.    Monte Nido appreciated or had knowledge of the benefits it received from Plaintiff and Class members.

159.    Plaintiff and Class members reasonably understood that Monte Nido would use adequate cybersecurity measures to protect the PHI that they were required to provide based on Monte Nido's duties under state and federal law and its internal policies.

160.    Monte Nido enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PHI.

161.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Monte Nido instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Monte Nido's failure to provide the requisite security.

162.    Under principles of equity and good conscience, Monte Nido should not be permitted to retain the full value of Plaintiff's and Class members' payment because Monte Nido failed to adequately protect their PHI.

163.    Plaintiff and Class members have no adequate remedy at law.

164.    Monte Nido should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

**(On Behalf of Plaintiff and the Class)**

165.     Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

166.     Given the relationship between Monte Nido and Plaintiff and Class members, where Monte Nido became guardian of Plaintiff's and Class members' PHI, Monte Nido became a fiduciary by its undertaking and guardianship of the PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Monte Nido did and does store.

167.     Monte Nido has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Monte Nido's relationship with them—especially to secure their PHI.

168.     Because of the highly sensitive nature of the PHI, Plaintiff and Class members would not have entrusted Defendant, or anyone in Monte Nido's position, to retain their PHI had they known the reality of Monte Nido's inadequate data security practices.

169.     Monte Nido breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PHI.

170.     Monte Nido also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

171.     As a direct and proximate result of Monte Nido's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CAUSE OF ACTION**
**Violation of Florida Deceptive and Unfair Trade Practices Act**

**Fla. Stat. §§ 501.201,** *et seq.*
**(On Behalf of Plaintiff and the Class)**

172.    Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

173.    This cause of action is brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

174.    The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

175.    Another purpose of FDUTPA is to construe consumer protection as "consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

176.    Plaintiff and Class members all constitute "[c]onsumers" under FDUTPA because they are all "individual[s]." Fla. Stat. § 501.203.

177.    Plaintiff and Class members each constitute an "[i]nterested party or person" under FDUTPA because they are all "affected by a violation" of FDUTPA. Fla. Stat. § 501.203.

178.    FDUTPA applies to Monte Nido because Monte Nido engages in "[t]rade or commerce" as defined as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203.

179.    FDUTPA declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

180.    FDUTPA provides that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act." Fla. Stat. § 501.204(2).

181.    Relevant here, is that "[v]iolation[s]" of FDUTPA is broadly defined to include violations of:

    a.    "Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 *et seq*." Fla. Stat. § 501.203.

    b.    "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Fla. Stat. § 501.203.

    c.    "Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203.

182.    Under FCRA, HIPAA (42 U.S.C. § 1302d et seq.), the FTCA, and Florida law (Fla. Stat. § 456.057 and § 501.171), Monte Nido was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class members' PHI. Monte Nido was also under an obligation expressly under Florida law, where Monte Nido is headquartered and managed, to adequately protect Plaintiff's and Class members' PHI.

183.    Moreover, FDUTPA requires that Monte Nido (1) take reasonable measures to protect and secure data in electronic form containing PHI; (2) take reasonable measures to dispose of or destroy PHI; and (3) provide notice to consumers and consumer reporting agencies subject to the FCRA when a data security incident occurs that compromises PHI. Fla. Stat. §§ 501.171.

184.    Monte Nido violated FDUTPA by, *inter alia*:

a.      failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PHI, which was a direct and proximate cause of the Data Breach;

b.      failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.      failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.      omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PHI; and

e.      omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

185.    Monte Nido's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Monte Nido's data security and ability to protect the confidentiality of their PHI.

186.    Monte Nido intended to mislead Plaintiff and Class members and induce them to rely on its omissions.

187.    Had Monte Nido disclosed to Plaintiff and Class members that its data systems were not secure—and thus vulnerable to attack—Monte Nido would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Monte Nido accepted the PHI that Plaintiff and Class members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class members acted reasonably in relying on Monte Nido's omissions, the truth of which they could not have discovered through reasonable investigation.

188.    Monte Nido acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class members' rights.

189.    As a direct and proximate result of Monte Nido's unfair and deceptive acts and practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PHI.

190.    And, on information and belief, Plaintiff's PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

191.    Plaintiff and Class members seek declaratory judgement that Monte Nido's practices were unreasonable and inadequate and thus caused the Data Breach.

192.    Plaintiff and Class members seek injunctive relief enjoining the wrongful acts described supra and requiring Monte Nido to use and maintain proper standards for data security

including, inter alia, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing. Fla. Stat. § 501.211(1).

193.     Plaintiff and Class members seek all monetary and non-monetary relief allowed by law. Plaintiff seeks actual damages, attorneys' fees, and costs under Fla. Stat. §§ 501.2105, 501.211(2).

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

194.     Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

195.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

196.     In the fallout of the Data Breach, an actual controversy has arisen about Monte Nido's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Monte Nido's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

197.     Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.     Monte Nido owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.     Monte Nido has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.      Monte Nido breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

      d.      Monte Nido breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

198.    The Court should also issue corresponding injunctive relief requiring Monte Nido to use adequate security consistent with industry standards to protect the data entrusted to it.

199.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Monte Nido experiences a second data breach.

200.    And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

201.    If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Monte Nido could experience if an injunction is issued.

202.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against Monte Nido and that the Court enter an order:

      A.      Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.   Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.   Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.   Enjoining Monte Nido from further unfair and/or deceptive practices;

E.   Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.   Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.   Awarding attorneys' fees and costs, as allowed by law;

H.   Awarding prejudgment and post-judgment interest, as provided by law;

I.   Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.   Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: August 15, 2024

/s/ *Joshua R. Jacobson*
Joshua R. Jacobson
Florida Bar No. 1002264
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
joshua@jacobsonphillips.com

Raina Borrelli*
raina@turkestrauss.com
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
T: (608) 237-1775
F: (608) 509-4423

* *Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*